IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 1:15-CR-115-ELR |
| JOHN P. KILL | : | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM

The United States of America, by and through its counsel, John A. Horn, United States Attorney, and Nathan P. Kitchens, Assistant United States Attorney for the Northern District of Georgia, hereby submits this response to Defendant John P. Kill's Sentencing Memorandum.

## INTRODUCTION

The Government agrees that, by all accounts, the Defendant has performed many admirable acts in his life and has been dedicated to his family. The Government also agrees that the Defendant is not likely to commit other criminal conduct and that making restitution to victims is an important goal that should be considered in sentencing. And the Government ultimately agrees that a downward variance is proper in light of these considerations. But the Defendant's request for a drastic variance from a guidelines range of 70–87 months of imprisonment to a probationary sentence is unwarranted and improper based on the 18 U.S.C.

§ 3553(a) factors. The Defendant's conduct justifies a meaningful term of imprisonment of 48 months in light of the grave seriousness of this offense, which impacted hundreds of victims, and the need for general deterrence.

## ARGUMENT

### I.      The Seriousness of the Offense Warrants a Substantial Custodial Sentence.

The Defendant's Sentencing Memorandum suggests that he made a "misguided," but not malicious, business decision, (Doc. 15 at 12), but the record reflects that this fraudulent scheme was conducted with deliberation over a lengthy period of time that took in millions of dollars. The Defendant held himself out as an insurance broker offering cargo insurance to trucking companies and generated policy binders falsely representing that the trucking companies would be insured by Lloyd's of London ("Lloyd's"). (PSR ¶ 7). In reality, none of the policies were bound by Lloyd's, and most of the victims received no insurance policies at all—the Defendant instead paid claims from new premium payments he collected to keep the scheme afloat. (Id.). In total, the Defendant embezzled approximately $3.75 million in premium payments paid by approximately 770 individuals and companies over the course of the fraud. (Id. ¶ 6; Chart of Premiums Received (attached as "Exhibit A")).

The flow of premium payments shows that this fraud continued for more than a year and that the amount of premiums collected escalated as the Defendant's

fraud expanded. Contrary to the Defendant's suggestion that his fraud was a "stop-gap answer," (Doc. 15 at 12), the Defendant collected premium payments over a span of eighteen months based on his false representation that policies would be bound by Lloyd's, and he only stopped when investigators executed search warrants and shut the Defendant's business down in mid-July 2014. <u>See</u> Exhibit A.

The premium payments also reflect that the Defendant's fraud was only growing larger until investigators shut down his operation. In the first six months of the fraud, from January 2013 through June 2013, the Defendant collected an average of $116,466.50 in premiums per month. <u>Id.</u> In the last six full months of the fraud, from January 2014 through June 2014, the Defendant collected an average of $289,875.81 in premiums per month. <u>Id.</u> The steady expansion of the fraudulent scheme fits the classic Ponzi scheme model—as more and more victims filed claims for covered losses, the Defendant needed to collect more and more new premium payments from new victims to cover the losses. In short, the Defendant's web of fraud, and the number of victims entangled in it, grew unabated until investigators uncovered the fraud and shut down his business.

The Defendant also falsely claims that the proceeds he collected from the fraud were used only to pay claims, salaries, and necessary business expenses. (Doc. 15 at 9–10). Bank records reflect that of the $3.75 million collected in the fraud, the Defendant paid approximately $1.35 million in insurance claims filed by

the victims, including over $100,000 paid to his claims adjuster, Crawford & Co.
See Chart of Use of Funds (attached as "Exhibit B"). Of the remaining $2.4
million, the Defendant paid himself approximately $70,000, withdrew another
$34,000 in cash, and paid family members at least $90,000. He also used the
victim's premium payments to make home mortgage payments, to pay a Mercedes-
Benz dealership $18,000 for a car, to pay his country club dues of more than
$17,000, and to pay thousands of dollars of other personal expenses ranging from
opera tickets to restaurant bills. The government seized the approximately
$725,000 remaining in the Defendant's business accounts after his spending, (PSR
¶ 12), leaving a shortfall of over $500,000 in restitution owed to cover victim
losses from his fraud.

The Defendant's Sentencing Memorandum also understates the seriousness
of his fraud measured by the toll suffered by victims. One measure of the scope of
the fraud is the loss amount, which the parties stipulated was between $1 million
and $2.5 million based on the $3.75 million in premiums collected over the
fraudulent scheme (and deducting for claims paid). (Id. ¶¶ 3, 6). Another measure
is the sheer number of victims, which included approximately 770 individuals and
companies. (Id. ¶ 6). But the true reflection of harm to victims is found not in the
raw numbers but in their individual stories of loss and financial hardship suffered
in the wake of the Defendant's fraud. For example, while the Defendant's

4

Sentencing Memorandum highlights a victim's statement that he hopes for full restitution instead of a prison sentence for the Defendant, the Memorandum ignores the detailed accounting of the harm to the victim. Specifically, the victim notes that the Defendant's fraud nearly bankrupted his company after the cleanup for two oil spills had to be paid out of pocket without the insurance coverage the Defendant had promised, that the victim faced repeated threats of lawsuits, and that the Defendant's fraud took a toll on his health and lifestyle. The Government hopes to highlight additional victims' stories at the sentencing hearing.

In short, the record reflects that the Defendant executed his fraudulent scheme with deliberation over a considerable period of time, took in millions of dollars at the expense of hundreds of victims, and continued to expand his fraud until the criminal investigation halted his scheme. The gravity of the harm caused by the Defendant requires a meaningful sentence of imprisonment.

## II.     The Need for General Deterrence Warrants a Substantial Custodial Sentence.

While the Government agrees that the Defendant is unlikely to commit another crime and there is little need for specific deterrence, the Defendant's request for a sentence of mere probation ignores an equally "important goal of sentencing in a white-collar crime prosecution:  the need for general deterrence." United States v. Kuhlman, 711 F.3d 1321, 1328 (11th Cir. 2013). The Eleventh Circuit has recognized that "[b]ecause economic and fraud-based crimes are more

rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation marks and alteration omitted); see also United States v. Hayes, 762 F.3d 1300, 1311 (11th Cir. 2014) (reversing downward variance to probation from guidelines range of 41–51 months when "the sentences do not provide for general deterrence because '[t]he threat of spending time on probation simply does not, and cannot, provide the same level of deterrence as can the threat of incarceration in a federal penitentiary for a meaningful period of time'" (quoting United States v. Livesay, 587 F.3d 1274, 1279 (11th Cir. 2009) (alteration in original))); United States v. Rodriguez, 537 F. App'x 840, 842 (11th Cir. 2013) (affirming 21-month upward variance in Ponzi scheme with guidelines range of 51-63 months based, in part, on court's desire to send message to "deter others from committing similar crimes").

The fraudulent scheme here shows the critical importance of general deterrence given the magnitude of the losses that affected so many victims in profound ways. In light of the lengthy period of the fraud and the Defendant's use of fraudulent proceeds for personal expenses, a sentence of probation would convey the message "that would-be white-collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty." Martin, 455 F.3d at 1240. The sentence imposed instead should send a strong message that

participating in a Ponzi-like scheme will not be tolerated and insurance brokers

cannot abuse the trust placed in them for personal gain.

### III.    The Defendant's Request for Probation Is Substantively Unreasonable under the 18 U.S.C. §3553(a) Factors.

Although the Defendant faces a guidelines range of 70 to 87 months'

imprisonment, the Defendant requests a radical downward variance to probation

with a period of home detention. This request, which amounts to at least a 16-level

downward variance,[1] is not justified by the record and would be substantively

unreasonable under the Section 3553(a) factors.

A line of cases in the Eleventh Circuit have vacated fraud sentences with

minimal or no terms of incarceration as substantively unreasonable. In two

published opinions that predate Gall v. United States, 552 U.S. 38, 128 S. Ct. 586

(2007), the Eleventh Circuit vacated sentences of imprisonment of less than a

month even though the defendants provided substantial assistance to the United

States. See Martin, 455 F.3d at 1230, 1238–39 (vacating sentence of 7 days'

imprisonment for defendant's participation in billion-dollar HealthSouth

Corporation fraud scheme after the United States argued for a 42-month term of

imprisonment following a Section 5K1.1 downward departure based on the

---

[1] Pursuant to the United States Sentencing Guidelines, a sentence of probation with a condition of home detention conforms with the guidelines only if the applicable guideline range is in Zone B of the Sentencing Table. USSG § 5C1.1(c)(3). The top of Zone B is Offense Level 11 with Criminal History Category I; the Defendant's Offense Level is 27. (PSR ¶ 27).

defendant's rendering "extraordinary" substantial assistance); United States v. Crisp, 454 F.3d 1285, 1291 (11th Cir. 2006) (vacating sentence of 5 hours' imprisonment for $480,000 bank fraud case after defendant provided substantial assistance because punishment did "not reflect the seriousness of the crime, promote respect for the law, and provide just punishment for the offense . . ., nor [did] it afford adequate deterrence to criminal conduct.").

Three published cases after Gall vacated probationary sentences in fraud cases as substantively unreasonable. See Hayes, 762 F.3d at 1311; Kuhlman, 711 F.3d 1321, 1328–29; Livesay, 587 F.3d at 1279–79. In Livesay, the Eleventh Circuit vacated a probationary sentence imposed on a HealthSouth defendant and held that a "meaningful period of incarceration" was required under the Section 3553(a) analysis, despite his substantial assistance provided to the United States. 587 F.3d at 1278–79. In Hayes, the district court sentenced a 67-year-old business owner to probation, with 6–12 months of home confinement, after varying downward from a guidelines range of 41–51 months based on his $600,000 bribery scheme. 762 F.3d at 1306. Although the district court found that the defendant provided substantial assistance to the government, "was genuinely remorseful, was not likely to commit further crimes, and was not a risk to the public," id. at 1308, the Eleventh Circuit vacated the sentence as substantively unreasonable given the seriousness of the offense and the failure to provide for general deterrence. Id. at

8

1310–11. And in <u>Kuhlman</u>, the district court sentenced the defendant in a $3 million health care fraud to probation, 57 months below the low end of his advisory guidelines range, based on his full restitution payment and 400 hours of community service performed before sentencing. 711 F.3d at 1326. The Eleventh Circuit vacated the sentence as substantively unreasonable, holding that it did "not reflect the seriousness and extent of the crime, nor [did] it promote respect for the law, provide just punishment, or adequately deter other similarly inclined health care providers." <u>Id.</u> at 1328–29. The Eleventh Circuit "encourage[d] our district court colleagues to keep in mind that . . . '[c]riminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.'" <u>Id</u>. at 1329 (quoting <u>United States v. Stefonek</u>, 179 F.3d 1030, 1038 (7th Cir. 1999)).

Here, the Defendant shares none of the mitigating circumstances cited by the districts courts to justify the extreme variances in those cases, which the Eleventh Circuit held were still insufficient to support the magnitude of the downward variances granted. Unlike the defendants in <u>Martin</u>, <u>Crisp</u>, <u>Hayes</u>, and <u>Livesay</u>, the Defendant did not provide substantial assistance to the Government that justified a Section 5K1.1 departure. And unlike the defendant in <u>Kuhlman</u>, the Defendant did not voluntarily pay full restitution to the victims before sentencing, but instead

consented to the forfeiture of funds the Government already had seized, which fall far short of the amount needed for restitution.[2] The Defendant cites no unique circumstances supporting a lengthy downward variance in this case, much less the 70-month variance requested.

## CONCLUSION

The Government has given full consideration to the factors raised in the Defendant's Sentencing Memorandum, including his lifetime of charitable acts, devotion to his family, and his desire to earn a living to repay as much restitution owed as possible. Accordingly, the Government agrees that a guidelines sentence is not necessary to provide deterrence or promote respect for the law, and the Government recommends a substantial downward variance to 48 months' imprisonment in light of these factors.

But the Defendant's request for probation and home detention simply goes too far. Under the Section 3553(a) factors, a lengthy prison sentence is required based on the seriousness of the Defendant's $3.75 million fraudulent scheme, his abuse of his victim's trust as an insurance broker, and the need to deter others from

---

[2] The Defendant's hope to repay the victims in full is laudable but likely unrealistic given the $500,000 shortfall in funds required to compensate the victims, even assuming all funds seized in forfeiture are applied to restitution. His request for a sentence of probation to permit him to earn funds for restitution would "essentially convert[] a theft by fraud into a loan that is unlikely to ever be repaid." Crisp, 454 F.3d at 1291.

engaging in similar schemes for personal gain. While the Defendant's request for probation fails to satisfy what the interests of justice and fairness demand, the Government's recommendation of 48 months' imprisonment does not. The Defendant deserves a sentence of 48 months' imprisonment, which will adequately reflect the gravity of his harm and send a strong message that insurance fraud of this magnitude will not be tolerated in this district.

 Dated:  this 21st day of August, 2015.

Respectfully submitted,

JOHN A. HORN
UNITED STATES ATTORNEY

 /s Nathan P. Kitchens
NATHAN P. KITCHENS
ASSISTANT U.S. ATTORNEY
600 Richard B. Russell Building
75 Spring Street, SW
Atlanta, Georgia 30303
Phone: (404) 581-6185
Fax: (404) 581-6181
Email: nathan.kitchens@usdoj.gov
Ga. Bar No. 263930

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above was prepared using Times New Roman 14

point font, and that I have caused a copy of the foregoing to be served upon

Counsel for the Defendant by electronic filing:

> Jeffrey L. Ertel
> Federal Defender Program, Inc.
> 101 Marietta Street
> Suite 1500
> Atlanta, GA 30303
> Jeff_ertel@fd.org

This 21st day of August 2015.

> /s Nathan P. Kitchens
> NATHAN P. KITCHENS